**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ELIZABETH J. HEUER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:11-CV-51 NAB |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the Commissioner's final decision denying Elizabeth J. Heuer's ("Heuer") applications for disability insurance benefits ("DIB") under Title II of the Social Security Act and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. Heuer alleges disability due to bipolar disorder, a knee replacement, and a hysterectomy. All parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. #11.) For the reasons set forth below, the Commissioner's decision is affirmed in part, reversed in part, and remanded for further consideration.

**I.**
**PROCEDURAL BACKGROUND**

On March 19, 2008, Heuer filed an application for a period of disability, seeking DIB and SSI. She alleged an onset date of September 1, 1995. (Tr. 149-50.) The Social Security Administration ("SSA") denied Heuer's claim and she filed a timely request for a hearing before an administrative law judge ("ALJ"). (Tr. 85, 108-12, 114.) The SSA granted Heuer's request and the hearing took place on February 18, 2010. (Tr. 11.) At the hearing, Heuer amended her

alleged onset date to February 29, 2008.  (Tr. 19.)  The ALJ issued a written decision on April 9, 2010, upholding the denial of benefits.  (Tr. 86-103.)

Heuer requested review of the ALJ's decision from the Appeals Council on May 10, 2010.  (Tr. 8.)  She submitted two pieces of additional evidence: a personal statement (Tr. 262-68) and a transcribed opinion from her treating psychiatrist (Tr. 837-60).  Counsel also prepared a short brief.  (Tr. 269-71.)  On May 31, 2011, the Appeals Council denied Heuer's request for review.   (Tr. 1-4.)   The decision of the ALJ thus stands as the final decision of the Commissioner.  *See Sims v. Apfel*, 530 U.S. 103, 107 (2000) (citing 20 C.F.R. §§ 404.900(a)(4)-(5), 404.955, 404.981, 422.210(a)).  Heuer filed this appeal on July 13, 2011.  (Doc. 1.)

## II.
## ADMINISTRATIVE RECORD

### A.    Hearing Testimony

The ALJ heard testimony from Heuer (Tr. 20-56) and John McGowan, a vocational expert ("VE") (Tr. 57-80).  Heuer was represented by counsel.  (Tr. 12.)

### 1.    Claimant's Testimony

Heuer testified that she had completed the twelfth grade.  (Tr. 55.)  She did not pursue post-secondary education, and had no vocational or technical training.  (Tr. 56.)

Heuer recalled being fired from a job four or five years before the hearing because she did not get along well with the other employees.  (Tr. 31.)  Her last job was as an office manager at the Franklin County Humane Society.  (Tr. 20.)  She worked on a computer, cleaned cages, walked dogs, cared for cats, and performed some maintenance work.  (Tr. 20-21.)  Her cleaning duties took about two hours at the start of each day.  (Tr. 21.)  She would sit for about three hours per day and walk for about four hours per day.  *Id.*  She sometimes had to lift animals and cages that weighed up to 50 pounds.  (Tr. 20-22.)  She testified that she had filled out the

description of her job at the Humane Society contained in an adult disability report and that it was accurate.  (Tr. 52-55; *see also* Tr. 199-200.)

In July 2006, Heuer underwent surgery for a partial knee replacement.[1]  (Tr. 22.)  In the months before she left the Humane Society, she missed one or two days of work every week.  (Tr. 29.)  She was unable to clean cages or do any lifting, and was limited to secretarial duties.  *Id.*  She testified that she left the Humane Society because she was experiencing knee pain and missing too many days of work.  (Tr. 28-29.)  In August 2008, she underwent surgery for a full knee replacement.  (Tr. 22.)

Heuer did not recall filling out a work activity report after applying for benefits.  (Tr. 43.)  She testified that the report was accurate in most respects, but that the notation that she had left the Humane Society due to a breakdown following her divorce was not correct.  (Tr. 44-45.)  She said that she was "shocked to see that."  (Tr. 45.)  She denied leaving the Humane Society because of the divorce.  (Tr. 42-44, 51.)

After her knee replacement, Heuer was given a walker to use.  (Tr. 46-47).  After her condition improved, her doctor gave her a cane to use.  (Tr. 47.)  She was using a cane at the time of the hearing.  *Id.*  She still used the cane after going through physical therapy.  (Tr. 46.)

Heuer testified that her knee condition prevented her from sitting for longer than half an hour at one time.  (Tr. 22-23.)  During the ninety-minute drive on her way to the hearing, she had her roommate stop the car twice to let her get up and move because of the pain in her knee.  (Tr. 35.)  She could stand for fifteen minutes at a time without pain, but she would get sharp, piercing pains on the sides of her knee if she stood up for too long.  (Tr. 23-24.)  Sometimes after standing for a long time, her knee would buckle and she would fall.  (Tr. 24.)  She testified that

---

[1] Throughout, "partial knee replacement" refers to a unicompartmental total knee arthoplasty, which is a complete replacement of one part of the knee.  This is in contrast to a "full knee replacement," which refers to a full total knee arthoplasty, in which the entire knee is artificially replaced.

these incidents started before her partial knee replacement.  (Tr. 22.)  One such incident occurred three days before the hearing.  (Tr. 24.)  She had trouble walking because it caused her knee to swell.  (Tr. 25.)  If she walked for too long, she would experience sharp, piercing pains in the sides of her knee and her foot would swell up.  *Id.*  She testified that she was unable to walk at a normal speed, and she had been using a cane for the past two years.  (Tr. 25.)

Heuer testified that when she spent too much time walking, she would have to stay in bed the next day.  (Tr. 25.)  She spent up to half an hour walking between 9 o'clock in the morning and 5 o'clock in the evening.  (Tr. 25-26.)  She spent three or four hours lying on her bed or her couch with her leg elevated to alleviate swelling.  (Tr. 26.)  She also applied ice to her knee to counter the swelling, and heat packs to her knee to help with the pain.  (Tr. 27.)  She testified that her knee problems prevented her from vacuuming and doing the dishes.  *Id.*  They also made it difficult to cook and do laundry.  (Tr. 27-28.)  When she went to the store, she used an electric cart.  (Tr. 28.)

Heuer testified that she had good and bad days.  On good days, she could walk to the mailbox.  (Tr. 22.)  On bad days, she would stay in bed and not do anything.  (Tr. 34.)  She had two or three bad days every week.  (Tr. 34.)

Heuer had gone to physical therapy for knee stiffness.  (Tr. 27.)  She rated the pain from her knee as being between 7-8 on a scale of 10 on an average day.  (Tr. 23.)  She could not bend over to pick something up, squat, kneel, or put any pressure on her knee.  (Tr. 23.)  She testified that she would be unable to stand for six out of eight hours because she thought her knee would buckle.  (Tr. 35.)  Likewise, she would be unable to sit for six out of eight hours because it would cause too much knee pain.  (Tr. 36.)

Heuer testified that she suffered from bipolar disorder.  (Tr. 29.)  During depressive episodes, she felt like she would "sink into a little hole inside [herself]" and "stare off into space."  (Tr. 30.)  She also spends days at a time in her room by herself.  *Id.*  During her manic episodes, she punched things and went on spending sprees.  (Tr. 30.)

Heuer used oxygen at night because of difficulty sleeping.  (Tr. 32.)  Nevertheless, she testified that her sleep was restless and that she would wake up tired.  (Tr. 32.)  She had been taking valium for anxiety during the five months before the hearing, which made her sleepy during the day.  (Tr. 32.)

Heuer suffered from frequent migraines that had begun five years before the hearing. (Tr. 34.)  She took daily medication for them.  *Id.*  She testified that the medication helped control them, and she had migraines about once every two weeks.  (Tr. 34.)

Heuer testified that she had difficulty meeting new people and making friends.  (Tr. 31, 33.)  She had difficulty concentrating.  (Tr. 33.)  Her medications prevented her from driving. (Tr. 28.)

Heuer smoked half a pack of cigarettes a day.  (Tr. 48.)  She testified that she had decreased her cigarette use near the start of November 2009.  (Tr. 49.)  She did not know why a medical record dated January 12, 2010, indicated that she smoked one pack per day.  (Tr. 49.)

### 2.    VE John McGowan's Testimony

The ALJ first asked the VE to describe each job that Heuer had worked in the past fifteen years by identifying the same or similar position in the *Dictionary of Occupational Titles* ("*DOT*"), giving the exertion level required for that position, giving the specific vocational

preparation ("SVP") level for that position,[2] and identifying any differences between how Heuer actually performed the work and how the work was described in the *DOT*.  (Tr. 57.)

The VE testified that Heuer had worked as a cashier II at three different convenience stores, which was light work with an SVP of 2.  (Tr. 57.)  She had worked as a receptionist, which was sedentary work with an SVP of 4.  (Tr. 57-58.)  She had worked as a waitress, which was light with an SVP of 3.  (Tr. 58.)  She had worked as an office manager at an auto shop and Sunshine Cleaning, which was sedentary with an SVP of 7.  (Tr. 58.)

The VE testified that Heuer's work at the Humane Society appeared to overlap multiple job descriptions in the *DOT*.  (Tr. 59.)  The VE opined that Heuer's job duties may have included work similar to an office manager; an animal keeper, which is medium work with an SVP of 4; or an animal shelter clerk, which is sedentary work with an SVP of 3.  *Id.*  The VE declined to express an opinion about what Heuer's work actually consisted of, but did testify that the *DOT*'s definitions were not comprehensive, a job could overlap multiple *DOT* categories, and even if a job title matched the *DOT* it was possible that the actual job was different from the *DOT* description.  (Tr. 59-60.)

The ALJ posed two hypotheticals based on a person of Heuer's work experience, education, and age.  The ALJ first asked about an individual who was limited to light work; was required to avoid all exposure to fumes, odors, dusts, gases, and poor ventilation; could understand and remember simple and detailed instructions; could carry out simple and detailed work instructions; could maintain adequate attendance and sustain an ordinary routine without special supervision; could interact adequately with peers and supervisors in a work setting; and could adapt to minor changes in a work setting that were within that individual's physical

---

[2] An SVP of 1-2 reflects unskilled work, an SVP of 3-4 reflects semi-skilled work, and an SVP of 5-9 reflects skilled work.  SSR 00-4p, 2000 WL 1898704, at *3 (S.S.A. Dec. 4, 2000).

abilities.  (Tr. 61-64.)  The VE opined that the individual would be able to do Heuer's past relevant work as a receptionist as it was performed in the national economy.  (Tr. 67.)

The ALJ next asked about an individual with Plaintiff's same age, education, and work experience who was limited to sedentary exertion; was required to avoid all exposure to fumes, odors, dusts, gases, and poor ventilation; was able to stand or walk with normal breaks for two hours out of an eight hour day but required the use of a handheld assistive device to do so; could not understand, remember, or carry out simple instructions; could not make judgments or simple work-related decisions, could not respond appropriately to supervision, coworkers, or usual work situations; and could not adapt to any changes in the work setting.  (Tr. 70-73.)  The VE opined that such an individual would be unable to do Heuer's past work or any work in the national economy.  (Tr. 73.)

Heuer's attorney posed two hypotheticals.  He first asked about an individual who was required to raise her legs three or four times, for 30-45 minutes at a time, during an eight-hour workday.  The VE opined that the individual would be unable to find employment.  (Tr. 79-80.) He then asked about an individual who would miss work four times per month because of physical and mental impairments.  (Tr. 80.)  The VE opined that such an individual would be unable to find full-time competitive employment.  (Tr. 80.)

The VE testified that, with the exception of his testimony about Heuer's work at the Humane Society, his testimony was consistent with the *DOT*.  (Tr. 74.)

## B.    Medical Records

On March 16, 2005, Heuer[3] saw Bruce A. Ayers, MD, at Patients First Internal Medicine. (Tr. 337).  Dr. Ayers noted a history that included bipolar disorder and left knee surgery because of an injury arising out of an automobile accident.  *Id.*  She was being treated by Dr. Krawczyk

---

[3] Records from this period, which predate Heuer's divorce, refer to her as Elizabeth Floyd.

for bipolar disorder.  (Tr. 337.)  She also had limited range of motion in her left knee with no swelling.  (Tr. 389.)  She reported smoking a pack a day of cigarettes, but planned to quit.  (Tr. 337.)

On January 12, 2006, Heuer's gynecologist noted that she was taking Zyprexa, Wellbutrin, and Prozac.  (Tr. 308.)

On February 20, 2007, Heuer went to Patients First Internal Medicine after an automobile accident.  (Tr. 331.)  She reported constant frontal migraine headaches since the accident.  *Id.* Karen Gross, APRN, planned to obtain a CT scan and to put Heuer on Imtrex if the scan was negative.  (Tr. 331.)

On February 22, 2007, Bradley Stufflebam, MD, performed a CT scan of Heuer's head. (Tr. 348.)  The scan showed no problems.  (Tr. 348.)

On February 23, 2007, Heuer complained of increased migraine pain.  (Tr. 332.)  Gross prescribed Topamax.  (Tr. 332.)

On June 5, 2006, Heuer visited Patients First Internal Medicine.  (Tr. 330.)  Among other things, she complained that her Prozac prescription was ineffective at treating her bipolar and caused her heartburn.  *Id.*  She was prescribed Cymbalta and discontinued Prozac.  (Tr. 330.)

On June 21, 2006, Heuer went to Patients First Health Care's orthopedic division in Washington, Missouri for a surgical evaluation by Thomas Matthews, MD.  (Tr. 320.)  Records note that previous treatment had failed, and surgery was recommended.  (Tr. 320.)

On July 11, 2006, Heuer was admitted to St. John's Mercy Hospital in Washington, Missouri ("Mercy"), to undergo surgery for a partial knee replacement based on a diagnosis of degenerative joint disease in her left knee.  (Tr. 276.)  Dr. Matthews noted that she took Prozac, Wellbutrin, Zyprexa, Premarin, Zyrtec, and Singulair.  (Tr. 276.)  Her medical history included

bipolar disorder and several left knee surgeries.  (Tr. 278.)  Dr. Matthews performed the operation with no complications.  (Tr. 282-83.)  She attended postoperative physical therapy and she was capable of walking independently when she was discharged on July 13.  (Tr. 275.)

On July 13, 2006, Dr. Matthews prescribed Lortab after Heuer reported that Vicodin was not effective.  (Tr. 320.)

On July 28, 2006, Heuer underwent postoperative evaluation at Patients First.  (Tr. 320.)  Radiographs indicated excellent alignment in her knee, both forward to backward and side to side.  *Id.*  She was prescribed Percocet.  *Id.*  Dr. Matthews recommended that she continue home health therapy for another week.  *Id.*  She was able to start a bike program, but he recommended that she continue to use her cane.  (Tr. 320.)

On August 29, 2006, Heuer returned to Patients First for evaluation.  (Tr. 319.)  She could walk very well with an excellent range of motion.  (Tr. 319.)

On September 18, 2007, Heuer visited Patients First.  (Tr. 319.)  Dr. Matthews noted an excellent range of motion and good stability.  *Id.*  There was no evidence of knee swelling, though Heuer complained of knee pain.  *Id.*  A radiograph showed that the implant was properly positioned.  *Id.*  Dr. Matthews prescribed Ultram.  (Tr. 319.)

On November 29, 2007, Heuer called Patients First Internal Medicine.  (Tr. 328.)  She reported that she was getting a divorce.  *Id.*  At Heuer's request, her Cymbalta prescription was increased.  (Tr. 328.)

On May 9, 2008, James L. Tichenor, Ph.D., performed a consultative psychological examination of Heuer.  (Tr. 352.)  He noted that she had a mild limp.  *Id.*  He found Heuer alert, cooperative, and well-oriented.  *Id.*  Her attention and concentration were normal, with adequate to average immediate memory function, average cognitive processing efficiency, but a lower

ability to maintain information in memory.  (Tr. 352-53.)  She had low average abstraction ability.  Her thought processes were logical and coherent.  (Tr. 353.)  She was concerned about money and her divorce.  *Id.*  She was mildly anxious but generally positive.  *Id.*  She reported not sleeping well depending on her mood.  *Id.*  She also reported two previous suicide attempts, in 1992 and 1997, but no current suicidal ideation.  *Id.*  She said that she enjoyed walking in the mall and in the woods, reading, cross-stitching, and her pets.  *Id.*  She thought she was able to be self-reliant.  *Id.*  According to a depressive symptom self-report, she had depressive behaviors in the mild range.  (Tr. 354.)  Dr. Tichenor concluded that she was able to understand and remember instructions, complete tasks, interact socially, and adapt satisfactorily in a low-stress environment.  *Id.*  He found that her symptoms were manageable with medication.  *Id.*  He recommended that she seek counseling.  *Id.*  He estimated that she could function at a level of 70 out of 100 on the global assessment of functioning ("GAF") scale.  (Tr. 354.)

On May 27, 2008, Glenn D. Frisch, MD, the state agency psychiatrist, completed a psychiatric review technique.  (Tr. 358-68.)  He found that Heuer's bipolar disorder was a medically determinable impairment, but it did not satisfy the criteria of Listing 12.04 for affective disorders.  (Tr. 360-61.)  Dr. Frisch believed that Heuer had a mild restriction of activities of daily living and moderate difficulties in maintaining concentration, persistence, or pace, but no difficulties in maintain social functioning and no episodes of decompensation of extended duration.  (Tr. 366.)  He gave "considerable weight" to Dr. Tichenor's conclusions as consistent with the evidence, and concluded that Heuer's mental impairment was mild to moderate.  (Tr. 367.)  Dr. Frisch then completed a mental RFC assessment.  (Tr. 355-57.)  He found that Heuer was moderately limited in only two of twenty areas: (1) the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms

and to perform at a consistent pace without an unreasonable number and length of rest periods, and (2) the ability to respond appropriately to changes in the work setting. (Tr. 356.) He concluded that Heuer could "understand and remember simple and detailed instructions," "carry out simple and detailed work instructions," "maintain adequate attendance and sustain an ordinary routine without special supervision," "interact adequately with peers and supervisors in a work setting," and "adapt to minor changes in a work setting that is within her physical abilities." (Tr. 357.)

On May 28, 2008, Cara Falter, a state disability examiner, completed a physical RFC assessment. (Tr. 369-74.) She found that Heuer could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk six hours during an eight hour work day, sit for six hours in an eight hour work day, and otherwise push or pull with no limitations. (Tr. 370.) She found that Heuer could frequently stoop, occasionally climb, kneel, crouch, or crawl, and never balance. (Tr. 373.) She based these conclusions on Dr. Matthews' postoperative notes indicating that the partial knee replacement was successful and stable, Heuer had an excellent range of motion, and Heuer exhibited no instability or swelling. (Tr. 370.) She also determined that Heuer should avoid all exposure to fumes, odors, dusts, gases, and poor ventilation because of her history of migraines. (Tr. 372.) Falter noted that no medical source statements were on file. (Tr. 374.)

On June 3, 2008, Heuer saw E. Glenn Browning, DO. (Tr. 664-65.) She reported injuring her left knee in an automobile accident in 1995, and having multiple surgeries after that. (Tr. 664.) She complained of discomfort in her left knee. *Id.* Specifically, squatting caused her pain, pressing on a protrusion caused her pain, and her knee would swell whenever she stood. *Id.* She complained that she had problems beginning six months after her surgery, but the notes available to Dr. Browning did not corroborate that. *Id.* Dr. Browning noted no redness or heat.

11

(Tr. 664.)   Her knee joint ground slightly when she moved it, but her range of motion was excellent.  *Id.*  X-rays showed that the partial knee replacement was properly positioned, and there was no evidence of loosening or infection.  He noted a minimal amount of possible bone death.  (Tr. 664-65.)

On June 21, 2008, Heuer was admitted to Samaritan Hospital emergency room after she fell.  (Tr. 417.)  She reported that she had a sharp pain in her left knee, and could neither bend nor bear her full weight on it.  (Tr. 417, 599.)  Walter Porter, MD, ordered an x-ray.  (Tr. 420.)  The x-ray revealed her partial knee replacement, but there was no definite loosening.  *Id.*  The radiologist suspected fluid leakage in the joint.  (Tr. 420, 835.)  Dr. Porter instructed Heuer to use an ACE wrap and a cane, and referred her to her primary care physician.  (Tr. 421.)  He prescribed Ultram.  *Id.*

On July 8, 2008, Heuer was seen by Dr. Browning.  (Tr. 662.)  X-rays of her knee showed some bone death.  *Id.*  Heuer and Dr. Browning discussed Orthovisc injections, but she elected to have total knee replacement surgery because her insurance did not cover the injections and because the injections were a temporary measure only.  (Tr. 662.)

On August 18, 2008, Heuer was admitted to Northeast Regional Medical Center in Kirksville, Missouri, for a total knee replacement by Dr. Browning after an examination had revealed degeneration in the portions of her knee that had not been replaced in 2006.  (Tr. 450.)  The preoperative diagnosis was a failed partial knee replacement and degenerative joint disease in the left knee.  *Id.*  Dr. Browning performed the procedure on the same day.  (Tr. 471-73, 542-44, 659-61.)  A test of material removed from Heuer's knee during the surgery was consistent with degenerative joint disease.  (Tr. 454, 545.)

On August 21, 2008, Heuer was discharged.  (Tr. 450, 539.)  The discharge summary notes that she briefly used a walker after the operation, but was walking with a cane by the time of discharge.  *Id.*  Her postoperative response was satisfactory.  *Id.*  She was prescribed Percocet for pain.  (Tr. 450, 539.)

On September 4, 2008, Heuer saw Dr. Browning.  (Tr. 658.)  She was still in significant pain.  *Id.*  Dr. Browning prescribed Percocet and Tylenol # 4.  A radiograph showed that Heuer's knee replacement was in position with no evidence of loosening or infection.  (Tr. 658.)

On September 5, 2008, Heuer was evaluated by Jeffrey Harden, DO, a psychiatrist.  (Tr. 822-824.)  She reported being treated by four other psychiatrists since 1988.  (Tr. 822.)  She was taking Cymbalta, Wellbutrin, and Zyprexa; none of which greatly helped her.  *Id.*  She had been diagnosed with bipolar disorder and social anxiety disorder, and had taken several medications for them.  *Id.*  She reported that her anxiety isolated her and caused problems with employment because it prevented her from getting along with others.  (Tr. 823.)  She reported three past suicide attempts, resulting in two hospitalizations (six weeks and three months).  *Id.*  The most recent one was in 2002.  *Id.*  She denied that she actually meant to kill herself on those occasions.  A mental status examination revealed good grooming, interactive eye conduct, logical thought process with no speech eccentricities, a flat affect, and a sad mood.  *Id.*  She said that she had diminished appetite, energy, motivation, concentration, sleep, and pleasure.  *Id.*  She said that she had panic attacks when she was required to leave her home.  *Id.*  While she was not currently suicidal, she reported suicidal ideation two months before.  (Tr. 823-24.)  Dr. Harden gave a diagnostic impression of major depressive disorder and social anxiety disorder.  (Tr. 824.)  He estimated Heuer's GAF score as 40, both at the time of the interview and as a maximum during the preceding year. *Id.*  He recommended psychiatric treatment.  (Tr. 824.)

13

On September 16, 2008, Heuer saw Dr. Browning.  (Tr. 657.)  She reported "popping" in her knee, which was preventing her from doing the full range of physical therapy exercises.  Dr. Browning noted that Heuer's range of motion had improved.  *Id.*  He felt that physical therapy could be continued and that the popping was not a cause for concern.  (Tr. 657.)

On November 4, 2008, Heuer saw Dr. Browning.  (Tr. 655.)  She said that she was experiencing some pain, but it was significantly less than it had been after the surgery.  *Id.*  X-rays showed that the knee replacement was in position and that there was no loosening or infection.  (Tr. 655.)

On January 9, 2009, Heuer saw Jamie Kauffman, DO, to establish care has her primary care physician.  (Tr. 388.)  She was taking Singular, Wellbutrin, Cymbalta, Synthoroid, Zyprexa, Topamax, and Premarin.  *Id.*  She worried that the Premarin interfered with her bipolar medications, and reported having mood swings and severe depression.  (Tr. 388, 705.)

On January 23, 2009, Heuer saw Dr. Kauffman.  (Tr. 702.)  He noted a spot on Heuer's right leg.  (Tr. 702.)

On January 30, 2009, Heuer saw Dr. Kauffman to have a skin lesion removed.  (Tr. 699.)

On January 30, 2009, Heuer saw Dr. Harden.  (Tr. 821.)  She said she was having difficulty managing her medications and began having mood swings.  *Id.*  She complained that she was not finding life pleasurable, had difficulty sleeping, and had suicidal ideation but not intent.  *Id.*  She reported being irritable and having panic attacks in crowded places.  *Id.*  Dr. Harden noted that she was calm, logical, and cooperative, with satisfactory memory and medium motivation.  *Id.*  He diagnosed bipolar disorder (depressive stage) and social anxiety disorder.  *Id.*  He reduced her Cymbalta prescription, continued her Wellbutrin prescription, discontinued Zyprexa, and started her on Abilify.  (Tr. 821.)

On February 11, 2009, Heuer saw Dr. Kauffman for a follow-up visit.  (Tr. 379.)  She reported stopping Chantix because it made her irritable.  *Id.*  She also reported switching from Zyprexa to Abilify, which had made her feel a little better.  *Id.*  She reported feeling somewhat better than before.  (Tr. 379, 695.)

On February 26, 2009, Heuer saw Dr. Kauffman complaining of a swollen gland in her neck, diarrhea, gas, a still-healing scar, and an upper respiratory infection.  (Tr. 691.)  Dr. Kauffman performed lab tests for the diarrhea, recommended vitamin E for the scar, and delayed treatment of the lymph node until the upper respiratory infection subsided.  (Tr. 692.)

On March 2, 2009, Heuer saw Dr. Harden for a medicine check.  (Tr. 820.)  She said that Abilify had helped her mood swings, but she was still having anxiety attacks when she went into public.  *Id.*  She reported having trouble sleeping, low motivation, poor energy in the morning, and an agitated mood.  *Id.*  Dr. Harden noted that she was calm and logical with a flat affect.  *Id.*  He continued her on Cymbalta, decreased Wellbutrin, increased Abilify, and decided to try her on Valium.  (Tr. 820.)

On April 7, 2009, Heuer saw Dr. Browning for a recheck of her total knee replacement.  (Tr. 654.)  She felt a constant sharp pain in her knee, and her range of motion had decreased.  *Id.*  Dr. Browning noted no redness, swelling, or the presence of fluid.  *Id.*  X-rays showed that Heuer's knee replacement was in position with no evidence of loosening or infection.  (Tr. 654.)

On April 7, 2009, Dr. Harden did a medication check with Heuer.  (Tr. 819.)  She reported discontinuing Valium because she felt that it did not help her.  *Id.*  Dr. Harden increased her Abilify prescription.  (Tr. 819.)

On April 13, 2009, Heuer saw Dr. Browning.  (Tr. 449.)  He performed manipulations on Heuer's knee under anesthesia and gave her injections of Marcaine and Kenalog.  *Id.*  He prescribed Tylenol #3.  (Tr. 449, 538, 651.)

On April 21, 2009, Heuer saw Dr. Browning for a follow-up after the manipulations.  (Tr. 650.)  He noted slow improvement.  *Id.*  Heuer reported less pain and greater strength.  *Id.*  She was not attending physical therapy, but instead exercising on her own three times per week at the YMCA.  (Tr. 650.)

On May 12, 2009, Dr. Harden did a medication check with Heuer.[4]  (Tr. 818).  She reported that she was improving emotionally and that the Abilify was decreasing her anxiety.  *Id.*  She was going out into public five days per week.  *Id.*  Dr. Harden made no changes to her medication.  (Tr. 818.)

On June 9, 2009, Heuer saw Dr. Harden for a medication check.  (Tr. 817.)  She reported having a terrible month.  *Id.*  Her neighbors were causing her stress by visiting frequently.  *Id.*  She would wake up nervous, and spend two or three hours pacing in order to calm down.  *Id.*  She reported an increase in her flow of ideas and impulsivity, and she was sleeping less.  *Id.*  She reported multiple anxiety attacks each day, with no particular cause.  *Id.*  Dr. Harden noted that she had entered the manic stage of bipolar.  *Id.*  He increased her Abilify dosage and reduced the Cymbalta to help her manic symptoms.  (Tr. 817.)

On July 7, 2009, a radiological examination of Heuer's knee ordered by Dr. Browning revealed no complications with her knee replacement, which was present and in good position.  (Tr. 535, 648.)  However, he thought her range of motion still needed improvement.  (Tr. 647.)  He noted no heat, no redness, and no other problems.  *Id.*  Heuer reported using a bicycle for

---

[4] This is the first chronological reference in the record to her name reverting to "Heuer."

range of motion exercises, and Dr. Browning recommended continued physical therapy.  (Tr. 647.)

On July 7, 2009, Heuer saw Dr. Harden for a medication check.  (Tr. 816.)  She reported discontinuing the Cymbalta, which eliminated her pacing episodes.  *Id.*  She was more relaxed. *Id.*  She had started Seroquel, which had reduced her mood swings, anxiety, and irritability.  (Tr. 816.)

On July 9, 2009, Heuer saw a pulmonology specialist, Humayun Lodhi, MD.  (Tr. 572- 575.)  She complained of shortness of breath, coughing, and disturbed sleep.  (Tr. 572.)  She said that she smoked a pack of cigarettes each day.  *Id.*  She told Dr. Lodhi that she bathed her cats every week.  *Id.*  Dr. Lodhi noted that Heuer was alert, oriented to time, place, and person, with normal judgment, insight, mood, and affect, and no apparent memory loss.  (Tr. 574.)  He also noted normal gait, muscle strength, and range of movement.  *Id.*  He planned to do a sleep study of Heuer.  *Id.*  He prescribed Advair, Avelox, and oral steroids.  *Id.*  He advised her to avoid driving an automobile if she had daytime drowsiness, and suspected that her prescriptions for Tylenol #3, Seroquel, and Phenergan might have to be discontinued to avoid hypersomnia.  (Tr. 574-75.)

On July 10, 2009, Heuer underwent a pulmonary function test.  (Tr. 727.)  Dr. Lodhi developed an impression of mild obstructive lung disease with a mild decrease in diffusing capacity.  (Tr. 727-78.)

On July 19, 2009, Heuer underwent a sleep study with Dr. Lodhi.  (Tr. 724.)  Dr. Lodhi found no evidence of a sleep-related breathing disorder.  *Id.*  However, Heuer snored significantly.  *Id.*  He recommended sleep hygiene, weight loss, and treatment for her snoring. (Tr. 677, 724.)

17

On August 4, 2009, Heuer saw Dr. Harden for a medication check.  (Tr. 815.)  She reported that she was doing well; except for problems with restless legs that she associated with Seroquel.  *Id.*  She was eating healthily, sleeping a little worse than before, had fair motivation, had poor concentration, and had low energy.  *Id.*  Dr. Harden noted that her attitude was good, she was calm, and her thought process was logical.  *Id.*  He discontinued the Seroquel and prescribed Valium.  *Id.*  Heuer believed that the Valium could help her more than before because her stress level was lower.  *Id.*  He cautioned her to avoid doing hazardous things if she felt drowsy.  *Id.*  He made an additional diagnosis of akathesia.[5] (Tr. 815.)

On August 5, 2009, Heuer saw Dr. Lodhi for a post-sleep study follow-up.  (Tr. 570.)  He noted that Heuer was alert and oriented; her judgment, insight, mood, and affect were normal; and no evident memory loss.  *Id.*  He also noted normal gait, muscle strength, and range of movement.  *Id.*  She was on Ability for bipolar, and her migraines were under control.  *Id.*  He continued Advair and albuterol, and directed Heuer to use oxygen while sleeping.  (Tr. 571.)

On October 6, 2009, Heuer saw Dr. Harden for a medication check.  (Tr. 814.)  She was satisfactory emotionally, but had lost sleep caring for a sick family member.  *Id.*  She was not leaving the home frequently.  *Id.*  She felt happy, her appetite was normal, and her motivation, concentration, and energy were all good.  *Id.*  She was reducing her cigarette intake, and was planning to quit.  *Id.*  Dr. Harden noted that she was passive and cooperative with a logical thought process and a modulated affect.  *Id.*  He made no changes to her medications.  (Tr. 814.)

On November 10, 2009, Heuer saw Dr. Lodhi.  (Tr. 568-69.)  He noted that she was alert and oriented, with normal judgment, insight, mood, and affect.  (Tr. 568.)  There was no evidence of memory loss.  Her gait, muscle strength, and range of movement were normal.  (Tr.

---

[5] Akathisia is "[a] syndrome characterized by an inability to remain in a sitting posture, with motor restlessness and a feeling of muscular quivering."  *Stedman's Medical Dictionary* 40 (27th ed. 2000).  It "[] appears as a side effect of antipsychotic and neuroleptic medication."  *Id.*

568).   He assessed her with bronchial asthma, chronic obstructive pulmonary disease, and hypoxia in sleep.  *Id.*  He once again noted that her migraines were under control and that she was taking Abilify for her bipolar disorder.  *Id.*  Heuer reported that she had cut down to half a pack of cigarettes and was attempting to quit smoking.  *Id.*  Dr. Lodhi continued prescriptions for Spiriva, Advair, and albuterol.  (Tr. 568-69.)

On November 12, 2009, Heuer saw Dr. Browning for a follow-up examination of her left knee.  (Tr. 645.)  She complained of pinching pain on both sides of her knee.  *Id.*  Dr. Browning noted no swelling, redness, or heat.  *Id.*  There were no problems at the incision site.  *Id.*  Her range of motion was excellent.  *Id.*  X-rays did not show either loosening or infection.  *Id.*  Dr. Browning refilled Heuer's Darvocet prescription and recommended continued physical therapy.  (Tr. 645.)

On December 4, 2009, Heuer saw Dr. Harden for a medication check.  (Tr. 813.)  She reported being tired because of poor sleep and a large amount of activity and stress.  *Id.*  However, she felt positive, her appetite was good, her motivation, concentration, and energy were all good, and she was usually getting a good amount of sleep, so she was rested.  *Id.*  She was having infrequent panic attacks.  *Id.*  Dr. Harden noted that she was calm and passive, with a bland affect.  *Id.*  He made no changes to her medications.  (Tr. 813.)

On December 7, 2009, Heuer's attempt to have her nighttime oxygen use recertified was refused by Dr. Kauffman because Heuer had not been evaluated in the past thirty days.  (Tr. 672.)

On January 12, 2010, Heuer saw Dr. Kauffman complaining of pain in her left calf.  (Tr. 667.)  An ultrasound was negative for deep vein thrombosis.  (Tr. 669.)

On February 1, 2010, Heuer saw Dr. Harden for a medication check.  (Tr. 812.)  She reported feeling depressed for the past four weeks, and would be grouchy and irritable for several hours for no reason.  *Id.*  She felt tired, was sleeping more but not feeling rested, and had low concentration, motivation, and energy.  *Id.*  Her appetite had decreased.  *Id.*  She had anxiety attacks twice per week.  *Id.*  Dr. Harden noted that she was passive and cooperative, with a logical thought process and a flat affect.  *Id.*  He diagnosed her as having entered the depressive stage of bipolar, and increased her Wellbutrin prescription.  (Tr. 812.)

On August 20, 2010, Dr. Harden gave a sworn statement.  (Tr. 837-60.)  Dr. Harden testified that he was board certified in general psychiatry and child and adolescent psychiatry.  (Tr. 841.)  He had begun seeing Heuer in September 2008, and had seen her intermittently since then.  (Tr. 841-42.)  He had diagnosed her with bipolar disorder (type I), social anxiety disorder, and akathisia.  (Tr. 842.)  He testified that Heuer's reported inability to concentrate on books, television, or a recipe, her failure to shower some days, her unwillingness to leave her bed some days, and her frequently crying were all consistent with the depressive state of her bipolar disorder.  (Tr. 843-44.)  He had prescribed Valium to treat Heuer's anxiety, Wellbutrin to combat the depressive aspects of Heuer's bipolar disorder, and Abilify to treat both manic and depressive symptoms.  (Tr. 845-46.)  He believed that Heuer's ability to concentrate and frequency of panic attacks were impacted by the fluctuating nature of her disorders and the intensity of stressors in her life.  (Tr. 846-47.)  He testified that Heuer could understand, remember, and carry out simple instructions, but would have intermittent and unpredictable problems following complex instructions depending on how severe her mental illness was at a given moment.  (Tr. 848.)  If Heuer were going through a severe worsening of her symptoms, she could have marked impairments in her ability to understand, remember, or carry out detailed instructions.  (Tr. 848-

49.)  He believed that a worsening of her disorders could also cause marked impairments in her ability to attend work, sustain a routine without supervision, interact with peers, interact with supervisors, and adapt to changes in the work setting.  (Tr. 849-50, 852.)  He testified that her manic stage could impair her judgment, increase her irritation, and lower her attention which would, in turn, make it difficult for her to understand people who communicated with her.  (Tr. 851.)  Her depressive stage would cause low motivation, a lack of energy, poor concentration, and emotional difficulty, which would also impair her ability to interact in the workplace.  (Tr. 851.)  Her anxiety disorder could cause her to avoid being around people and ignore them if she were sufficiently uncomfortable, which he believed she had done in the past.  (Tr. 852.)  He testified that, as a receptionist, Heuer would have difficulty interacting with walk-ins because of motivation problems associated with her depressive stages and because of her social anxiety disorder.  (Tr. 852-53).  Her manic episodes would interfere with her ability to operate a telephone system, and her anxiety would cause her to avoid answering calls from unknown people.  (Tr. 853.)  She would, however, not be significantly impaired in writing memoranda, typing reports and correspondence, and similar tasks.  (Tr. 853-54.)  Dr. Harden testified that Heuer's motivation problems were a result of her bipolar disorder, and she would not be able to control her motivation.  (Tr. 854.)  He believed that when Heuer's disorders worsened, she would be unable to cope with the demands of being a receptionist in a medical practitioner's office because she would be emotionally labile, inattentive, scared of interacting with new people, and already having difficulty managing stress and anxiety.  (Tr. 855-56.)

On February 28, 2011, Heuer was admitted to the Boone Hospital Center in Columbia, Missouri, for a revision to her total knee replacement.  (Doc. 19-1, at 3.)  She complained that she could only walk limited distances and that she had difficulty sleeping at night.  *Id.*  A

physical examination revealed only 10-40 degrees of flexion in her left knee, but it was stable. *Id.* X-rays showed that there was no infection, but her bones had not grown into the artificial joint well.  (Doc. 19-1, at 3.)  The operation was performed on the same day by Peter K. Buchert, MD.  (Doc. 19-1, at 5-6.)

On March 1, 2011, Heuer was able to sit, stand, begin physical therapy, and use a continuous passive motion device.  (Doc. 19-1, at 1).  Dr. Buchert noted that she did well.  (Doc 19-1, at 1.)

On March 2, 2011, Heuer was discharged from Boone Hospital Center.  Dr. Buchert noted in the discharge report that she had continued to improve after the operation, and was able to walk on her own.  *Id.*  A follow-up appointment was scheduled.  Dr. Buchert prescribed Norco and Coumadin.  (Doc. 19-1, at 1.)

### III.
### DECISION OF THE ALJ

The ALJ found that Heuer met the insured status requirements through March 31, 2013. (Tr. 91.)  The ALJ found that Heuer had not engaged in substantial gainful activity since February 29, 2008.  (Tr. 91.)  The ALJ found that she had the severe impairments of "status post left knee replacement," migraines, hypothyroidism, sleep disorder, depressive disorder, bipolar disorder, social anxiety disorder, mild obstructive lung disease, and nicotine addiction.  (Tr. 91.) The ALJ found that Heuer did not have a listed impairment or a medical equivalent.  (Tr. 92-95.) The ALJ determined that Heuer retained the residual functional capacity ("RFC") to perform light work with the following restrictions: no exposure to fumes, odors, dusts, gasses, and poor ventilation; no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs, stooping, kneeling, crouching, and crawling; and frequently balancing.  He determined that she could understand, remember, and carry out simple and detailed work instructions; maintain

22

adequate attendance; sustain an ordinary routine without special supervision; interact adequately with peers and supervisors; and adapt to minor changes in the work setting.  (Tr. 95-101.)  Based on this RFC, the ALJ found that Heuer could perform her past relevant work as a receptionist, as it is performed in the national economy.  (Tr. 101-103.)  The ALJ thus found that Heuer was not disabled.  (Tr. 103.)

## IV.

## STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529.  "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'"  *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004)).  In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b).  Second, the claimant must have a severe impairment.  20 C.F.R. §§ 416.920(c), 404.1520(c).  The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities … ."  *Id.*  "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work."  *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations.  20 C.F.R. §§ 416.920(d), 404.1520(d);

Part 404, Subpart P, Appendix 1.  If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history.  *Id.*

Fourth, the impairment must prevent claimant from doing past relevant work.[6]  20 C.F.R. §§ 416.920(e), 404.1520(e).  At this step, the burden rests with the claimant to establish his or her Residual Functional Capacity ("RFC").  *Steed v. Astrue*, 524 F.3d 872, 874 n.3 (8th Cir. 2008).  *See also Eichelberger*, 390 F.3d at 590-91; *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004).  RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b)-(e).  The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f).  If it is found that the claimant can still perform past relevant work, the claimant will not be found to be disabled.  *Id.*; 20 C.F.R. § 416.920(a)(4)(iv).  If the claimant cannot perform past relevant work, the analysis proceeds to Step V.

At the fifth and last step, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work.  20 C.F.R. § 416.920(a)(4)(v).  If it is found that the claimant cannot make an adjustment to other work, the claimant will be found to be disabled.  *Id.  See also* 20 C.F.R. § 416.920(g).  At this step, the Commissioner bears the burden to "prove, first that the claimant retains the RFC to perform other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to perform."  *Goff*, 421 F.3d at 790; *Nevland v. Apfel*, 204 F.3d

---

[6]  "Past relevant work is work that [the claimant] has done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [claimant] to learn how to do it." *Mueller v. Astrue*, 561 F.3d 837, 841 (8th Cir. 2009) (citing 20 C.F.R. § 404.1560(b)(1)).

853, 857 (8th Cir. 2000).  The Commissioner must prove this by substantial evidence.  *Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir. 1983).

If the claimant satisfies all of the criteria of the five-step sequential evaluation process, the ALJ will find the claimant to be disabled.  "The ultimate burden of persuasion to prove disability, however, remains with the claimant."  *Id.  See also Harris v. Barnhart*, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)).

This court reviews the decision of the ALJ to determine whether the decision is supported by "substantial evidence" in the record as a whole.  *See Smith v. Shalala*, 31 F.3d 715, 717 (8th Cir. 1994).  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002). *See also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).  Therefore, even if a court finds that there is a preponderance of the evidence against the ALJ's decision, the ALJ's decision must be affirmed if it is supported by substantial evidence.  *Clark v. Heckler*, 733 F.2d 65, 68 (8th Cir. 1984).  In *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

As such, "[the reviewing court] may not reverse merely because substantial evidence exists for the opposite decision."  *Lacroix v. Barnhart*, 465 F.3d 881, 885 (8th Cir. 2006) (quoting *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996)).  Similarly, the ALJ decision may not be reversed because the reviewing court would have decided the case differently.  *Krogmeier*, 294 F.3d at 1022.

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. *Cox*, 495 F.3d at 617; *Guillams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). Weighing the evidence is a function of the ALJ, who is the fact-finder. *Masterson v. Barnhart*, 363 F.3d 731, 736 (8th Cir. 2004) (citing *Benskin v. Bowen*, 830 F.2d 878, 882 (8th Cir. 1987). The factual findings of the ALJ are conclusive if supported by substantial evidence. See 42 U.S.C. § 405(g). The district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001) (citing *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

> (1) The findings of credibility made by the ALJ;
>
> (2) The education, background, work history, and age of the claimant;
>
> (3) The medical evidence given by the claimant's treating physicians;
>
> (4) The subjective complaints of pain and description of the claimant's physical activity and impairment;
>
> (5) The corroboration by third parties of the claimant's physical impairment;
>
> (6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and
>
> (7) The testimony of consulting physicians.

*Brand v. Sec'y of Dept. of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980); *Cruse v. Bowen*, 867 F.2d 1183, 1184-85 (8th Cir. 1989). Additionally, an ALJ's decision must comply "with the relevant legal requirements." *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A).

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced."  *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).  A claimant's subjective complaints may not be disregarded solely because the objective medical evidence does not fully support them.  *Id.*  The absence of objective medical evidence is just one factor to be considered in evaluating the claimant's credibility and complaints.  *Id.*  The ALJ must fully consider all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:

> (1) the claimant's daily activities;
>
> (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;
>
> (3) any precipitating or aggravating factors;
>
> (4) the dosage, effectiveness, and side effects of any medication; and
>
> (5) the claimant's functional restrictions

*Id.*  The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the claimant's complaints.  *Guillams*, 393 F.3d at 802; *Masterson*, 363 F.3d at 738.  "It is not enough that the record contains inconsistencies; the ALJ

must specifically demonstrate that he considered all of the evidence." *Id.* (citing *Butler v. Sec'y of Health & Human Servs.*, 850 F.2d 425, 429 (8th Cir. 1988)).  The ALJ, however, "need not explicitly discuss each *Polaski* factor." *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004).  *See also Steed*, 524 F.3d at 876 (citing *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000)).  The ALJ need only acknowledge and consider those factors.  *Id.*  Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence.  *Rautio v. Bowen*, 862 F.2d 176, 179 (8th Cir. 1988); *Millbrook v. Heckler*, 780 F.2d 1371, 1374 (8th Cir. 1985).

## V.
## DISCUSSION

Heuer makes several arguments on appeal.  Many of these arguments are interrelated, and so will be discussed in the broader context of Heuer's alleged physical and psychological limitations.  Heuer argues that the ALJ improperly relied on the opinion of a pulmonologist to evaluate Heuer's psychological limitations, relied on the opinion of a one-time examining physician, failed to credit information provided by her live-in partner, gave great weight to the opinion of a non-physician disability examiner, and failed the develop the record.  Heuer also argues that the Appeals Council did not apply the proper legal standard in evaluating the newly-submitted opinion of her treating physician and failed to give good reasons for discounting that same opinion.[7]  Substantial evidence supports the ALJ's findings with regard to Heuer's physical limitations.  However, because substantial evidence does not support the ALJ's findings as to Heuer's psychological limitations, the matter will be remanded to the Commissioner for further consideration.

---

[7] Heuer does not challenge the ALJ's finding that her subjective complaints were not credible.

**A.      The Credibility of Heuer's Roommate**

The ALJ declined to give significant weight to the third party adult function report of

Sylvester Skinner, Heuer's live-in partner.  (Tr. 101; *see also* Tr. 209-17.)  The ALJ cited three

reasons for discounting Skinner's information: his lack of medical training, his relationship to

Heuer, and the inconsistency of his testimony and the record.  Heuer argues that greater weight

should have been given to the information provided by Skinner.

It would be improper to discount Skinner's evidence simply because he is not a trained

medical practitioner.  Skinner filled out a form indicating what Heuer did and did not do.  He did

not offer a diagnosis or a medical opinion.  He simply reported what he observed and what Heuer

told him.   Indeed, the regulations contemplate that "non-medical sources" will be used to

evaluate a claim of disability.  *See* 20 C.F.R. §§ 404.1513, 416.913.

Further, the Court is unable to ascertain from an examination of the record how Skinner's

evidence is inconsistent with the record.  Neither the ALJ in his decision nor the Commissioner

in his brief point to any specific inconsistencies.  Indeed, the ALJ found Skinner's report reliable

enough to use it to discredit Heuer's hearing testimony.  (Tr. 98.)  Skinner's evidence mainly

consisted of a description of Heuer's daily activities, evidence that appears to not be directly

contradicted elsewhere in the record, except to the extent that reports from her doctors may

indicate that Heuer is not as limited as she appears to act.

On the other hand, the ALJ also discounted Skinner's evidence because of his

relationship to Heuer.  As Heuer's roommate, Skinner has a financial interest in her obtaining

benefits.  This is a proper basis upon which to discount third party evidence.  *See Choate v.*

*Barnhart*, 457 F.3d 865, 872 (8th Cir. 2006) ("Corroborating testimony of an individual living

with a claimant may be discounted by the ALJ, as that person has a financial interest in the outcome of the case.") (citing *Rautio v. Bowen*, 862 F.2d 176, 180 (8th Cir. 1988)).

Even if Skinner's report is taken at face value, however, it does not establish that Heuer is disabled, nor does Heuer even attempt to explain how it would.  Indeed, Skinner reported that Heuer helps with house and yard work (Tr. 211), goes out by herself several times per week (Tr. 212), goes to stores (Tr. 212), can usually follow directions without a problem (Tr. 214), and handles changes in routine well, albeit with some disorientation (Tr. 215).  In terms of Heuer's limitations, the report is relatively vague.  It describes Heuer as having "high days" and "low days," but does not indicate how frequently each happens, nor explain how it impacts Heuer. (Tr. 214.)  It notes that Heuer sleeps a lot during depressive periods, but does not state for how long she sleeps.  (Tr. 210.)  It reports that she has insomnia, but there is no indication of the frequency.  (Tr. 210.)  According to the report, Heuer's knee only permits her to help for "short periods," but does not offer an estimate of time.  (Tr. 211.)  It says that she "spaces out" in stores, but describes neither how often this happens nor how this affects Heuer.  (Tr. 212.)

In short, while there is little to suggest that the report is not credible, there is also little to directly establish that Heuer is disabled.  The report merely provides a basis for inferences about the severity of Heuer's limitations that the ALJ is not required to make, particularly if those inferences are belied by medical evidence and opinions.  There mere fact that Heuer has some limitations does not mean that she is utterly unable to function.  It is plain that the ALJ chose to believe certain medical records over any inferences that could be made from Skinner's report. This is entirely proper: "If, after reviewing the record, the court finds it is possible to draw two different positions from the evidence and one of those positions represents the ALJ's findings,

the court must affirm the ALJ's decision.  *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005). If

it was error for the ALJ to find Skinner's report incredible, then that error was harmless.

**B.      Psychological Limitations: Dr. Harden's Opinion, Dr. Tichenor's Opinion, and Dr. Lodhi's Notes**

Heuer asserts that the Commissioner should have adopted the opinion of her treating

psychiatrist, Dr. Harden.  That opinion was unavailable to the ALJ, but it was considered by the

Appeals Council.  The Appeals Council found that Dr. Harden's opinion regarding the severity

of Heuer's limitations was unsupported by his own treatment records.  (Tr. 2.)

Heuer first asserts that the Appeals Council applied the wrong standard in evaluating Dr.

Harden's opinion.  However, the standard of review remains the same as it would be had the

record been in front of the ALJ.  "In cases involving the submission of supplemental evidence

subsequent to the ALJ's decision, the record includes that evidence submitted after the hearing

and considered by the Appeals Council."  *Bergmann v. Apfel*, 207 F.3d 1065, 1068 (8th Cir.

2000) (citing *Jenkins v. Apfel*, 196 F.3d 922, 924 (8th Cir. 1999).  In such a situation, "[a] court's

role is to determine whether the ALJ's decision 'is supported by substantial evidence on the

record as a whole, including the new evidence submitted after the determination was made.'"  *Id.*

(citing *Riley v. Shalala*, 18 F.3d 619, 622 (8th Cir. 1994)).  "In practice, this requires [a] court to

decide how the ALJ would have weighed the new evidence had it existed at the initial hearing."

*Id.* (citing *Riley*, 18 F.3d at 622).  Thus, the appropriate inquiry is not whether the Appeals

Council erred, but whether the record as a whole supports the decision made by the ALJ.  *Perks*

*v. Astrue*, No. 11-3041, 2012 WL 3168495, at *5 (8th Cir. Aug. 7, 2012) (citing *Cunningham v.*

*Apfel*, 222 F.3d 496, 500 (8th Cir. 2000)).[8]

_____

[8] For these reasons, the Commissioner's arguments about what the ALJ had in front of him at the time he made his decision are basically irrelevant.  Dr. Harden's opinion, despite the Commissioner's disparagement, *see* Doc. 25,, at 10-11 n.1, is relevant to the resolution of the case because it was before the Commissioner at the Appeals Council

As Heuer's treating psychiatrist, Dr. Harden's opinion would have been particularly important in the ALJ's evaluation of the record.  It is well-established that "[t]he opinion of a treating physician is accorded special deference and will be granted controlling weight when well-supported by medically acceptable diagnostic techniques and not inconsistent with other substantial evidence in the record."  *Dipple v. Astrue*, 601 F.3d 833, 836 (8th Cir. 2010) (citing 20 C.F.R. § 404.1527(c)(2)); *see also* 20 C.F.R. § 416.927(c)(2).  "Even if the opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight."  *Samons v. Astrue*, 497 F.3d 813, 818 (8th Cir. 2007) (internal quotation marks removed).  However, "while a treating physician's opinion is generally entitled to substantial weight, such an opinion does not automatically control because the hearing examiner must evaluate the record as a whole."  *Wagner v. Astrue*, 499 F.3d 842, 849 (8th Cir. 2007) (internal quotations omitted).  "[A]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions."  *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (quoting *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005)).

The ALJ found, *inter alia*, that Heuer retained the RFC to understand, remember, and carry out detailed instructions; maintain adequate attendance; interact adequately with peers and supervisors; and adapt to minor changes in the work setting.  (Tr. 95.)  The ALJ specifically noted that there were no opinions in the record indicating that Heuer's limitations were greater than these findings.  (Tr. 100.)  The ALJ accorded great weight to the findings of Dr. Frisch, the state agency's disability examiner who never actually saw Heuer, as being consistent with the

level.  Even if the ALJ did nothing wrong at the time he assessed the evidence before him, the Court's  standard for review requires that the ALJ's decision be examined in light of the new evidence before the Appeals Council.

record.  (Tr. 101.)  These findings were virtually identical to the ALJ's, and were based on the opinion of Dr. Tichenor, the consultative psychologist.  (Tr. 368; *see* Tr. 352.-54.)

In contrast, Dr. Harden believed that when Heuer experienced a worsening of her mental diseases, she could have marked impairments in her ability to maintain adequate attendance, interact with peers and supervisors, sustain a routine without supervision, and adapt to changes in the work setting.  (Tr. 849-50, 852.)  He also believed that a worsening of her mental disorders could cause marked impairments in her ability to carry out detailed instructions.  (Tr. 848-49.)  This opinion was effectively given no weight in the ALJ's RFC determination, for the obvious reason that it was not available to the ALJ.

The Court finds that the ALJ's decision would have been different had Dr. Harden's opinion been available to him.  The opinion of Dr. Frisch relied heavily on the opinion of Dr. Tichenor, a one-time examining source.  Ordinarily, the opinion of physicians that examine a claimant once or not at all do not constitute substantial evidence on the record as a whole.  *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2008) (citing *Kelley v. Callahan*, 133 F.3d 583, 509 (8th Cir 1998).  As Dr. Frisch's report relies upon Dr. Tichenor's, they cannot be considered cumulative, independent evidence that might together coalesce into substantial evidence.

The Commissioner argues that Dr. Tichenor's opinion was supported by Dr. Harden's treatment notes.  This argument echoes the ALJ's finding that Dr. Frisch's opinion was consistent with the record.  (Tr. 101.)  This is not the case.  Dr. Tichenor believed that Heuer was "a mildly depressed individual who is experiencing stressful circumstances given her current divorce and living arrangements," and estimated a GAF score of 70.  (Tr. 354.)  Dr. Harden's initial evaluation showed a much lower GAF of 40.  (Tr. 824.)  The treatment notes also reveal periods of frequent panic attacks (Tr. 812, 817, 818, 820, 821), manic episodes (Tr. 817, 819),

depressive episodes that include tearfulness and suicidal ideation (Tr. 821), and periods of unprovoked depression and irritability (Tr. 812).  Moreover, Dr. Tichenor's only diagnosed bipolar by history.  (Tr. 354.)  Dr. Harden not only confirmed a diagnosis of bipolar disorder, but also diagnosed social anxiety disorder, an additional impairment that Dr. Tichenor was evidently unaware of.  When Dr. Harden's opinion, based on his thorough treatment notes, is considered, Dr. Trichenor's opinion (and thus Dr. Frisch's opinion) does not supply substantial evidence upon which to disregard Dr. Harden's opinion.

Nor do the treatment notes of Dr. Lodhi, a pulmonologist, and Dr. Kauffman, Heuer's primary care physician, constitute substantial evidence.  Dr. Lodhi's notes from July 9, 2009, reflect that he performed a basic examination of Heuer in connection with his pulmonary consultation.  The psychiatric portion of this examination revealed no problems: Heuer's mood, affect, judgment, insight, alertness, and orientation all appeared normal.  (Tr. 574-75.)  The ALJ cited these treatment notes in his discussion of whether Heuer's psychological impairments met or medically equaled a listing at step three.  (Tr. 92-93.)  A cursory mental status examination by a pulmonologist, who is concerned with a patient's respiratory health, is not substantial evidence to discount entirely the mental health opinion of a treating psychiatrist.  Similarly, the treatment notes of Dr. Kauffman are not substantial evidence that Dr. Harden's opinion deserves little weight.  Dr. Kauffman saw Heuer for a variety of physical maladies, including left calf pain (Tr. 667), oxygen recertification (Tr. 672), a swollen gland (Tr. 691), and a skin lesion (Tr. 699).  Indeed, when Heuer first established care with Dr. Kauffman, he referred her to psychiatry for treatment.  (Tr. 705.)  Dr. Kauffman's cursory notes are not substantial evidence.

Additionally, the ALJ relied on the lack of evidence supporting greater functional limitations in formulating Heuer's RFC.  This rationale is undermined by Dr. Harden's opinion.

It thus seems likely that Dr. Harden's opinion, based on multiple interactions with Heuer over a period of over a year, permitting Dr. Harden to obtain a longitudinal perspective on Heuer's mental impairments, would have been given at least some weight by the ALJ, if not the significant weight that it would ordinarily be due.

The Commissioner next asserts that the Appeals Council's statement that Dr. Harden's opinion was unsupported by his treatment notes was "a proper basis . . . to reject Dr. Harden's opinion."  (Doc. 25, at 12.)   As explained above, this Court's role is to examine the ALJ's decision in light of the new evidence because the Appeals Council declined review, not consider the Appeals Council's statement.  *See Cunningham v. Apfel*, 222 F.3d 496, 500 (8th Cir. 2000) ("In these circumstances, we do not evaluate the Appeals Council's decision to deny review.") Nevertheless, while the Commissioner properly identifies unsupportability as a proper basis for rejecting a treating physician's opinion, Dr. Harden's opinion appears to be well-supported by medically acceptable clinical diagnostic techniques.  Dr. Harden recorded treatment notes from each of his meetings with Heuer.  (Tr. 812-24.)  These notes contained information about what Heuer told Dr. Harden, as well as Dr. Harden's own observations of Heuer's mental state: "symptoms" and "signs" under the regulations.  *See* 20 C.F.R. §§ 404.1529, 416.928.   The appointments formed the basis for Dr. Harden's diagnosis.  (Tr. 842.)  Dr. Harden's opinions were not conclusory; indeed, he discussed the effects of bipolar disorder (Tr. 842-43) and social anxiety disorder (Tr. 843), and tied those effects into his opinion about Heuer's functional limitations (Tr. 847-856).  There is room to determine just how severe Heuer's limitations are because the ultimate determination of RFC is an issue for the Commissioner.  20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2).   However, Dr. Harden's opinion is not so unsupported by his treatment notes as to make the failure to give it any weight harmless.  Heuer is entitled to have

her treating doctor's opinion considered and be given "good reasons" for the weight given his opinion. *See* 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2).

The Court finds that there is not substantial evidence on the record as a whole to justify completely disregarding Dr. Harden's opinion.   It is not internally inconsistent, the other evidence in the record is not better supported by more thorough records or evaluations, the only other meaningful psychological examination was performed by a one-time consultant, and the notes from Heuer's pulmonologist and primary care physician – neither of whom endeavored to treat Heuer's mental health problems – are not sufficient to wholly undermine the opinion of her treating psychiatrist.

However, Dr. Harden's opinion leaves unanswered some important questions that should be examined upon remand.  First, it will be necessary for the adjudicator to determine how the cyclical nature of Heuer's psychological disorders will impact her ability to function.  It is clear from the record that Heuer experiences periods of what Dr. Harden termed "worsening." However, it is not clear how frequently they occur, whether they can be managed by medication, or how they would impact her ability to work.  It will also be necessary to determine how much weight to afford Dr. Harden's opinion that Heuer has several marked limitations.   Then, the adjudicator will be able to reformulate Heuer's RFC, this time giving an appropriate amount of weight to Dr. Harden's opinion, and reconsider whether Heuer is able to perform any past relevant work or any work in the national economy.

Finally, Heuer argues that the ALJ failed to adequately develop the record by not obtaining an opinion from Dr. Harden.  Because Dr. Harden's opinion submitted to the Appeals Council will be addressed on remand by the ALJ, the Court will not address this issue.

C.      **Physical Limitations: Disability Examiner Cara Falter's Opinion & Development of the Record by the ALJ**

Heuer argues, and the Commissioner concedes, that the ALJ's reliance on the opinion of Cara Falter, the non-physician state disability examiner, was inappropriate. *See Dewey v. Astrue*, 509 F.3d 447, 449 (8th Cir. 2007).  However, Heuer and the Commissioner disagree about whether this error was harmless.  This error is harmless if "the ALJ would inevitably have reached the same result if he had understood that the Residual Functional Capacity Assessment had not been completed by a physician or other qualified medical consultant." *Id.* at 449-50.  The ALJ's error in *Dewey* was found to be not harmless because the record contained a more restrictive opinion from the claimant's treating physician. *Id.* at 449.  Here, there is no such opinion, but neither is there an opinion supporting the ALJ's RFC finding.

At the same time, Heuer argues that the ALJ failed to develop the record.  RFC is a medical question. *Eichelberger*, 390 F.3d 584, 591 (8th Cir. 2004).  It is true that "[a] disability claimant has the burden to establish her RFC." *Id.* (citing *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004).  However, the ALJ has an independent duty to develop the record despite the claimant's burden. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).  "Some medical evidence must support the determination of the claimant's RFC." *Eichelberger*, 390 F.3d at 591 (citing *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000)) (internal quotation marks omitted).  "[T]he ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace.'" *Id.* (quoting *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2003)).

Though it is a close question, the Court believes that the ALJ's decision was supported by substantial evidence.  In *Eichelberger*, the court found that substantial evidence supported the ALJ's denial of benefits at step four where the claimant's subjective complaints had been

discredited, no physician had placed significant work-related limitations on the claimant, and treatment notes indicated that the claimant's had good strength in her shoulder. *Id.* at 591. Here, Heuer's subjective complaints have been discredited, no physician has placed work-related limitations on her. Further, at least until the date of the administrative hearing, Dr. Browning, her surgeon, noted continued improvement in her range of motion (Tr. 645, 657), increased strength in her knee (Tr. 650), and recommended continued physical therapy (Tr. 645, 647). *See Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009) ("A lack of functional restrictions on the claimant's activities is inconsistent with a disability claim where, as here, the claimant's treating physicians are recommending increased physical exercise.") And, as the burden to show she could not perform her past relevant work was on Heuer, the adverse determination was a failure to carry that burden instead of a failure to develop the record. *See Eichelberger*, 390 F.3d at 592.

Finally, Heuer urges the Court to take into consideration evidence of another total knee replacement that took place in 2011. (*See* Doc. 19-1.) Heuer's hearing date was April 9, 2010. While evidence dated after the hearing date is not per se irrelevant, in this case, the evidence does not relate back to the period of time before April 9, 2010. This evidence could be relevant to a claim of disability with an onset date after that period of time.

## VI.
## CONCLUSION

For the reasons set forth above, the Court finds that substantial evidence on the record as a whole does not support the Commissioner's decision that Heuer is not disabled.

The Court finds that this matter should be reversed and remanded to the Commissioner of Social Security for further consideration pursuant to 42 U.S.C. § 405(g), sentence 4. Upon remand, the ALJ is directed to re-examine the record in a manner consistent with this Court's opinion.

Accordingly,

**IT IS HEREBY ORDERED** that the relief which Heuer seeks in her Complaint and Brief in Support of Complaint is **GRANTED** in part and **DENIED** in part.  [Docs. 1, 19.]

**IT IS FURTHER ORDERED** that a Judgment of Reversal and Remand will be filed contemporaneously with this Memorandum and Order remanding this case to the Commissioner of Social Security for further consideration pursuant to 42 U.S.C. § 405(g), sentence 4.

Dated this 23rd day of August, 2012.

                                                       /s/ Nannette A. Baker
NANNETTE A. BAKER,
UNITED STATES MAGISTRATE JUDGE